## THE HOMERIC.

(District Court, S. D. New York. February 7, 1901.)

SHIPPING—CARGO DAMAGE—SEAWORTHINESS OF VESSEL—BREAKING OF PROPELLER KEY—SEA PERILS.

While a steamer was maneuvering to avoid collision with other vessels in an open roadstead during a storm, her propeller came in contact with a can buoy and was injured. The matter was reported to the Lloyd's surveyor, under whose supervision the vessel's engines were then being repaired preparatory to a voyage under a charter, the propeller was inspected and repaired to his satisfaction, and the vessel's certificate was renewed. The propeller was also examined and tested by the ship's officers and engineer, and no looseness of the parts was discovered. The vessel then entered upon her voyage, and after proceeding more than 6,000 miles, with very tempestuous and trying weather, with heavy seas, during which there was much straining of the vessel and racing of the engines, the propeller became unserviceable, and it was found that the key had become ruptured and lost. Being obliged to go into dry dock for repairs, the cargo suffered loss and injury from unloading and reloading; and the charterer brought suit for damages, alleging the unseaworthiness of the vessel by reason of the injury received prior to the commencement of the voyage. The vessel was new and of the highest class. *Held,* that it could not be inferred from the facts shown that the propeller key had sustained any injury prior to the voyage, but that such injury should, rather, be referred to the nearer and adequate cause of sea perils.

In Admiralty. Suit for damage to cargo.

Carter & Ledyard, for libelants.

Convers & Kirlin, for respondents.

BROWN, District Judge. The above libel was filed to recover damages in the transportation of a cargo of nitrates by the steamer Homeric from Iquique, Chili, to New York from June to August, 1900. On the voyage the steamer was compelled to put into Montevideo for repairs to her propeller, which became unserviceable when near Montevideo through the rupture of the key. The ship was obliged to go upon dry dock and to unload about 2,600 tons of the nitrates, which suffered a loss of weight from discharging, and in reloading after the repairs were completed. The accident caused also a loss of about a month's time in the steamer's arrival at New York, during which there was a fall in the market price. The libelants claim to recover for both items of loss, on the ground that the vessel as respects her propeller, was in an unseaworthy condition when she left Iquique. The respondents claim that the vessel was in a seaworthy condition, and that the injury to the propeller and the consequent detention were due to sea perils alone.

The ship was chartered under a charter party executed at Valparaiso on March 29, 1900, which required her to be in readiness to take in cargo at Iquique by May 31st. She went to Valparaiso to have her engines put in order before entering upon the execution of the charter party. While lying there in an open roadstead, a heavy blow came on, in the course of which, while maneuvering to avoid collision

with other vessels and in moving astern, the propeller came in contact with a can buoy, as charged in the libel, or as afterwards suggested, with the chain by which the buoy was moored. Subsequent examinations showed that two of the blades had pieces broken off at the stern edges, extending nearly three feet from the tips of the blades and from three to four inches in width in the widest part. The libelants contend that the rupture of the propeller key was caused by an injury to the key through the violence of the impact against the buoy or the chain on May 12th. The matter was reported to one of Lloyd's surveyors at Valparaiso, under whom the previous repairs were proceeding, and a further examination was made by him with certain recommendations, and afterwards on May 14th he gave his certificate that all recommendations had been completed to his satisfaction. The propeller blades and the nut that screwed up the boss were also examined by the engineer, the master and the mate; and no sign was found of any other damage than to the edge of the blades above stated, or of any loosening of the parts. The propeller was also subjected by the engineer to the test of reversal at Valparaiso from full speed ahead to full speed astern and no jar was discovered, such as any looseness of the propeller boss or key would have caused. Upon these examinations, trials and the certificate of the surveyor, the ship proceeded 1,100 miles to Iquique, loaded her cargo, sailed thence on May 29th, touched at Coronel for coal on June 4th, where her propeller was also reversed without anything irregular noticeable, and the same night again put to sea. Going through the Straits of Magellan, she traveled some 6,000 miles, passing through considerable stormy weather, high seas, rolling, pitching and racing of the engines, until she arrived on June 18th near Montevideo, as above stated, when the propeller slipped back and became unserviceable. It caught against the rudder post, which prevented its falling into the sea. On examination of the shaft and boss the key was found gone, the slot slightly worn, and the thread of the nut and shaft entire.

The case is an interesting one from the discussion and care that have been bestowed upon it, the testimony of the experts, as well as the uncertainty attending any explanation of the rupture of the key, or the precise manner in which the boss became loosened and fell back.

The steamer was comparatively new and had the highest class. She had been surveyed on dry dock less than six months before and duly certificated; and after the contact with the can buoy she was again examined and her certificate renewed. This is abundant prima facie evidence of seaworthiness. Considering, therefore, that the burden of proof is upon the libelants to show some actual or probable injury to the key at Valparaiso, and considering the testimony in evidence concerning the prior repairs, the examinations by the most competent persons, the certificate of her seaworthiness and the application of the usual tests before leaving Valparaiso, I think this burden has not been sustained, and that the circumstances proved

and all the facts disclosed of her subsequent long voyage, first from Valparaiso to Iquique, and from thence to Montevideo, the long time that elapsed and the heavy weather experienced, do not justify the finding that any injury was sustained by the key at Valparaiso, or that the ship was unseaworthy·on leaving Iquique. Independently even of the burden of proof, as a question of reasonable probability, it seems to me that had any injury been received by the key from the contact with the can buoy or the chain at Iquique, it would have developed into some noticeable disability long before reaching Montevideo; while on the other hand, the long time and the sea perils' encountered before reaching Montevideo, according to the testimony, were sufficient to produce the rupture of the key, and should reasonably be considered its cause, rather than a contact with the buoy of the character shown by the evidence, so long previously. The Frey (C. C. A.; Jan. 4, 1901) 106 Fed. 319.

Capt. Kerr, a witness called by the libelant, said that from Coronel they had strong breezes and high seas most of the way with variable weather until June 13th, when they had a very "strong gale with a mountainous sea which strained the ship considerably, the decks full of water and the ship laboring and racing heavily."

Davies, the chief engineer, also called by the libelant, said that:

"For two or three days before the accident, the weather had been very bad; very high head sea causing the ship to plunge very heavily, the engines had been racing and the ship plunging. It was dead ahead, causing the ship to plunge more violently than the same sea would have done had it been in any other direction."

Wiley, the chief engineer, also called by the libelant, says on June 13th, 14th and 15th—

"They had a strong head wind and heavy sea running; engines racing heavily."

His log contains similar entries.

The mate's log from June 5th to 15th has many entries of the same kind:

On June 5th, "High sea causing ship to roll and strain heavily and decks continually flooded; rolling and straining heavily."
June 6th, "Confused sea, high head swell." June 7th, same.
June 8th, "Strong breeze and high cross sea. Ship rolling and straining heavily and decks continually flooded."
June 13th, "Moderate gale and high sea." Later: "Full gale and mountainous head sea, ship pitching and straining heavily and taking large quantities of water over the bow." Later: "Gale continues, ship straining heavily; mountainous head sea, decks flooded fore and aft."
June 14th, "Fresh breeze, high sea, ship pitching heavily." Later: "Confused swell." June 15th, "High swell."

"Upon the testimony in the case, the above circumstances of navigation were sufficient to produce the rupture of the key. The breakdown occurred shortly afterwards; and this near, adequate cause should, therefore, be regarded as the true cause, rather than the contact with the buoy at Valparaiso so long anterior, and which seems to me negatived by the long period and the great amount of work done by the propeller after the steamer left Valparaiso.

It was not reasonably incumbent on the owner, as it seems to me, to put the steamer on dry dock and remove the propeller, when the examinations made and the application of tests give no indication of any need of docking. The fact that Lloyd's surveyor who was directing the repairs, did not suggest docking, shows that it was not deemed necessary. This would not be in any way conclusive, if it now appeared certain that any injury had been then done to the boss or key, nor if there were any such constraining inference of fact. But in truth there is no evidence whatever of any defect in the key at that time, or of any injury to it then received. In this respect the case differs from the usual cases of alleged latent defect where evidence of such undoubted defect is produced on the trial. Here the court is asked to infer it from the mere fact that the key gave way over a month afterwards, and after a long voyage with very tempestuous and trying weather. For the reason above stated this it seems to me cannot reasonably be done.

The libel should be dismissed with costs.